IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., 40 West 20th Street, 11th Floor New York, NY 10011-4231 | ) ) ) ) ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, P.O. Box 710 Tucson, AZ 85702 | ) ) ) ) ) ) | Civil Case No. 21-00770 ECF Case |
| and | ) ) | |
| FRIENDS OF MINNESOTA SCIENTIFIC AND NATURAL AREAS, 2854 Cambridge Lane Mound, MN 55364 | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| UNITED STATES FISH & WILDLIFE SERVICE, | ) ) ) | |
| MARTHA WILLIAMS, in her official capacity as the Acting Director of the U.S. Fish & Wildlife Service, | ) ) ) ) | |
| and | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) | |
| *Defendants.* | ) ) ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     This action challenges the failure of the U.S. Fish & Wildlife Service, Acting Director Martha Williams, and the U.S. Department of the Interior (collectively, the Service) to designate critical habitat for the endangered rusty patched bumble bee (the bee). Despite a statutory mandate that such habitat must generally be designated when a species is listed as endangered, and notwithstanding ample evidence that habitat safeguards would be beneficial for— and indeed necessary to—the bee's survival and recovery, the Service refused to designate critical habitat on the basis that doing so would be "not prudent."

2.     Once common throughout the midwestern and northeastern United States, northward into Canada, the bee has disappeared from the vast majority of its native range and now stands on the brink of extinction, owing to habitat loss and destruction, pesticide use, disease, parasites, and climate change.

3.     As a result, in 2017, the Service listed the bee as an "endangered species" under the Endangered Species Act (ESA). Endangered Species Status for Rusty Patched Bumble Bee, 82 Fed. Reg. 3186, 3205 (Jan. 11, 2017).

4.     The bee's listing triggered the Service's duty to designate critical habitat for the bee "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A)(i). However, despite continued threats to the bee from habitat loss and degradation, in September 2020 the Service determined that designating critical habitat for the bee would be "not prudent" and declined to protect any critical habitat for the bee. Determination That Designation of Critical Habitat is

Not Prudent for the Rusty Patched Bumble Bee, 85 Fed. Reg. 54,281, 54,284 (Sept. 1, 2020).

5.     But the ESA allows the Service to withhold critical-habitat designation as "not prudent" only in those rare instances where designation would not benefit a species.

6.     In withholding designation as "not prudent" for reasons other than lack of benefit to the bee, the Service stretched this narrow exception far beyond its legal limits, and ignored abundant evidence that protecting habitat facilitates the species' survival and recovery. If permitted to stand, the Service's unlawfully broad interpretation of the "not prudent" exemption may also deprive countless other vulnerable species of crucial habitat protections.

7.     Plaintiffs seek an order setting aside the Service's decision not to designate critical habitat for the bee and requiring the Service to designate such habitat within one year.

**PARTIES**

8.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a non-profit membership organization dedicated to safeguarding the earth—its people, its plants and animals, and the natural systems on which all life depends. Promoting and enforcing strong protections for endangered and threatened species is central to NRDC's work to protect wildlife and ecosystems.

9.     NRDC is headquartered in New York, NY, and has additional offices in Washington, DC; Chicago, IL; Santa Monica and San Francisco, CA; Bozeman, MT; and Beijing, China.

10.     NRDC brings this lawsuit on behalf of its hundreds of thousands of members nationwide. Many of these members regularly observe, visit, study, or otherwise enjoy threatened and endangered species, including the bee. Leaving the habitat of such species without critical-habitat protection harms the interests of these members in viewing listed species in the future.

11.     For example, NRDC member Clay Bolt of Livingston, Montana, is a professional photographer, documentarian, and leader in the conservation field who has on several occasions photographed the bee in its habitat. Mr. Bolt plans to continue visiting the bee's habitat, including areas in Wisconsin, Minnesota, and Appalachia, to seek out and photograph the bee. Mr. Bolt plans to use these photographs to publish a field guide to bumble bees of the Americas.

12.     Mr. Bolt derives aesthetic, recreational, and economic benefits from the bee's continued existence and his visits to the bee's habitat. Those interests are threatened by the Service's decision not to designate critical habitat for the bee under the ESA.

13.     Additionally, NRDC member Jason Taylor is the Executive Director of the Bur Oak Land Trust (the Land Trust), which owns and maintains twelve properties spanning about 500 acres, predominantly in Johnson County, Iowa. Mr. Taylor developed a personal and professional interest in the bee in 2018, soon after

he learned it was listed as a federal endangered species, and he identified one in the prairie he planted in his backyard. As a result, he began developing habitat restoration projects for the bee on Land Trust properties and continues to train volunteers to identify the bee throughout Johnson County. These volunteers have identified rusty patched bumble bee populations on five Land Trust properties.

14.    Mr. Taylor also regularly visits the Coralville Reservoir, a federally owned recreational area in Johnson County. He visits Coralville Reservoir about twice a month and searches for the bee every time he visits. Although he has not been successful yet, one of his goals for 2021 is to spot the bee at Coralville Reservoir. The Land Trust owns two properties adjacent to Coralville Reservoir, Turkey Creek and Big Grove Nature Preserves, each containing rusty patched bumble bee populations. Mr. Taylor and the Land Trust seek to preserve land surrounding the Coralville Reservoir because the Reservoir creates a natural corridor home to myriad native species, from bobcats to bees. Mr. Taylor values the Coralville Reservoir and these surrounding nature areas as important recreational fixtures of the community.

15.    Through his work at the Land Trust and regular visits to Coralville Reservoir and other areas of Johnson County to search for the bee, Mr. Taylor derives professional and recreational benefits from the bee and its habitat. Mr. Taylor is concerned that continued failure to designate critical habitat for the bee will result in the bee's extinction.

16.     NRDC's members, including Mr. Bolt and Mr. Taylor, derive aesthetic, recreational, professional, economic, and personal benefits from the bee and its habitat. The Service's failure to designate critical habitat decreases the bee's chances of survival and recovery, thereby harming NRDC members' interests in the bee. These injuries are caused by the Service's violations of the ESA and the Administrative Procedure Act (APA) and are redressable through the relief requested by Plaintiffs.

17.     Plaintiff Center for Biological Diversity (Center) is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including Washington, DC. The Center has more than 84,000 members, including many who reside in, explore, and enjoy the areas in which the bee and its current and historic habitat are found. The Center's mission is to protect and conserve endangered species, including the bee, and their habitats.

18.     The Center brings this action on behalf of its members who derive aesthetic, recreational, emotional, spiritual, and scientific benefits from the bee and its continued existence in its native habitat.

19.     The Center's members, including Bryan Newman and Andrew Wedel, visit rusty patched bumble bee habitat on an ongoing basis in the hopes of viewing and enjoying the bee and its native habitat.

20.     Mr. Newman, Mr. Wedel, and other Center members derive aesthetic, recreational, inspirational, emotional, and spiritual benefits from their visits to rusty patched bumble bee habitat in the hopes of viewing the bee. Mr. Newman, Mr. Wedel, and other Center members intend to continue their frequent visits to the bee's habitat. For Mr. Newman, this includes occupied habitat along the shore of Como Lake in St. Paul, Minnesota, where he has frequently observed the bee. He plans to revisit these areas on an ongoing basis, including this coming spring, summer, and fall when the bee is active. Mr. Wedel frequently searches for the bee on his family's prairie land in southwestern Wisconsin, where he and his family work to preserve and restore the bee's habitat. Many of the areas that Mr. Newman, Mr. Wedel, and other Center members intend to continue using and enjoying include areas that may be suitable for designation as critical habitat and that could play an essential role in the bee's survival and recovery if they were designated as such.

21.     The aesthetic, recreational, inspirational, emotional, spiritual, and scientific interests of Mr. Newman, Mr. Wedel, and other Center members have been and will continue to be adversely and irreparably affected if the Service's ongoing violations of the ESA continue. These are actual, concrete injuries caused by the Service's violations of the ESA. The relief sought will redress the Center's members' injuries.

22.     Plaintiff Friends of Minnesota Scientific and Natural Areas (FMSNA) is a Minnesota non-profit, tax-exempt corporation organized to advocate for the

protection, management, and perpetuation of Minnesota's Scientific and Natural Areas in an undisturbed natural state. These more than 160 scientific and natural areas represent a diverse set of natural habitats containing rare and sensitive plant and animal species. FMSNA vigorously defends against actions that threaten the ecological integrity of these areas, including those that threaten resident species that FMSNA members cherish.

23.     FMSNA brings this action on behalf of its members who derive aesthetic, artistic, recreational, spiritual, and other interests from the bee and its habitat. For example, Thomas E. Casey of Mound, Minnesota, a longstanding member of FMSNA and the Chair of FMSNA's Board of Directors, has sought out, and continues to regularly seek out, the bee. Mr. Casey is an amateur photographer and has on two occasions photographed the bee in Lone Lake Park in Minnetonka, MN, and within the city of St. Paul, MN. He hikes nearly every day, visiting regional parks in the Twin City region, the Minnesota Valley National Wildlife Refuge, and other natural areas in Minnesota where the bee may be present or to which the bee may disperse. Mr. Casey brings his camera on every hike and always seeks out rare and interesting wildlife, including the bee.

24.     Mr. Casey's aesthetic, recreational, and artistic interests in the bee have been and will continually be threatened by the Service's failure to designate critical habitat for the bee. These injuries are caused by the Service's violations of the ESA and APA, and are redressable through the relief requested by Plaintiffs.

25.     Defendant U.S. Fish & Wildlife Service is an agency of the United States government, within and under the jurisdiction of the U.S. Department of the Interior. The Secretary of the Interior has delegated authority to administer and implement the ESA to the Fish & Wildlife Service. The Service is legally responsible for the failure to designate critical habitat for the bee.

26.     Defendant Martha Williams is sued in her official capacity as Acting Director of the U.S. Fish & Wildlife Service. Through delegation of authority from the Secretary, Ms. Williams is legally responsible for the failure to designate critical habitat for the bee.

27.     Defendant U.S. Department of the Interior is an agency of the United States government charged with implementing and administering the ESA. The Secretary has delegated that authority to the Service, which is a government agency within the Department of the Interior. The Department of the Interior is legally responsible for the failure to designate critical habitat for the bee.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g) (ESA citizen suit provision), 5 U.S.C. § 704 (APA), and 28 U.S.C. § 1331 (federal question jurisdiction).

29.     This Court has the authority to issue the requested declaratory and injunctive relief pursuant to 16 U.S.C. § 1540(g) (ESA), 5 U.S.C. § 706(2) (APA), and 28 U.S.C. §§ 2201–02.

8

30.     Plaintiffs provided all Defendants with written notice of Plaintiffs'
intent to file this suit more than sixty days prior to the commencement of this
action. *See* 16 U.S.C. § 1540(g)(2). This written notice is attached as Exhibit A to
this Complaint.

31.     Defendants have not remedied their violations of the law in response to
Plaintiffs' written notice.

32.     Venue is proper in the U.S. District Court for the District of Columbia
pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because a substantial
part of the events giving rise to the Plaintiffs' claims occurred in this district.
Specifically, the U.S. Department of the Interior and Fish & Wildlife Service are
headquartered in Washington, DC. Further, Defendant Martha Williams—an
official responsible for applying and interpreting the ESA, including as it applies to
the challenged decision—is located here. Plaintiffs NRDC and the Center also have
offices in Washington, D.C. Finally, Washington, DC is within the bee's historic
range.

## STATUTORY AND REGULATORY FRAMEWORK

**The Endangered Species Act**

### *Background and purpose*

33.     Congress enacted the ESA in 1973 in response to growing concern
about the extinction of species. The ESA's purpose is to "conserv[e] . . . endangered
species" and provide "a means whereby the *ecosystems* upon which endangered
species . . . depend may be conserved," 16 U.S.C. § 1531(b) (emphasis added). An

endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

34.     Almost since the ESA's inception, courts have recognized Congress's plain intent to give the benefit of the doubt to imperiled species. "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

### *Protection of critical habitat*

35.     Safeguarding habitat is a central component of species conservation under the ESA. Upon listing a species as endangered, the Service must designate any habitat that is considered to be "critical habitat" for that species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A). The Service must make that determination based on the "best scientific and commercial data available." *Id.* § 1533(b)(2).

36.     Congress defined "critical habitat" to include both areas that are occupied by the species and those that are unoccupied. Occupied critical habitat is defined as "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i). Unoccupied critical habitat means "specific areas outside the geographical area occupied by the species . . . upon a

determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A)(ii). Unoccupied critical habitat may include, for example, areas with abundant food sources and nesting sites that could accommodate new members of a species as its population recovers.

37.     If, at the time of listing, the Service finds that critical habitat is not yet determinable, the agency may extend the deadline for designating such habitat by one additional year. At the end of that year, the Service must "publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." *Id.* § 1533(b)(6)(C)(ii).

38.     Once the Service designates an area as critical habitat, that area is subject to the interagency consultation requirements of section 7 of the ESA, *id.* § 1536.

39.     Section 7 requires all federal agencies to consult with either the Service or National Marine Fisheries Service (NMFS) to "insure" that their actions are not likely to "jeopardize the continued existence" of listed species or "result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2). Agencies must consult with the Service regarding impacts to terrestrial and freshwater species and critical habitat, and with NMFS regarding impacts to marine species and critical habitat.

40.     With respect to critical habitat, a federal agency generally must formally consult with the Service or NMFS regarding any action that "may affect" such habitat. 50 C.F.R. § 402.14(a). Formal consultation culminates in a biological

opinion written by the Service or NMFS, which describes whether the action at issue will destroy or adversely modify critical habitat and identifies any reasonable and prudent measures and alternatives necessary to avoid this result. *Id.* § 402.14(h).

41.     Designation of critical habitat—and the consultations triggered by designation—provides mandatory, substantive protections for species' habitat. In occupied critical habitat, protection against destruction or adverse modification of habitat is separate from, and additional to, protection against jeopardy to a species. *See* 16 U.S.C. § 1536(a)(2) (separately prohibiting actions that are likely to "jeopardize the continued existence" of species and those that "result in the destruction or adverse modification" of critical habitat). In unoccupied critical habitat, protection against adverse modification of habitat is the most significant form of conservation that the Service provides under the ESA.

### *The "not prudent" exception to designating critical habitat*

42.     In requiring the Service to designate critical habitat to the "maximum extent prudent," Congress created a limited exception for circumstances when designation would be not prudent. *Id.* § 1533(b)(6)(C)(ii).

43.     While the ESA does not define the term "prudent," Congress plainly intended the "not prudent" exception to be narrow and applied only where designating critical habitat would not benefit a species. *See, e.g.*, H.R. Rep. No. 95-1625, at 16-17 (1978) (designation of critical habitat is not prudent where it "would not be in the best interests of the species"); *id.* at 17 (explaining that "[n]ot prudent"

12

determinations are reserved for "rare circumstances where the specification of critical habitat . . . would not be beneficial to the species").

44.     "Prudent" is commonly defined as "careful and avoiding risks," *Prudent*, Cambridge Dictionary, https://dictionary.cambridge.org/us/ (last visited Mar. 22, 2021); and "acting with or showing forethought; . . . circumspect, discreet, cautious; [and] far-sighted," *Prudent*, Oxford English Dictionary, https://www.oed.com/ (last visited Mar. 22, 2021).

45.     For years, the Service abided by Congress's intent and the ordinary meaning of "prudent" by defining the "not prudent" exception to apply in only two limited circumstances. First, designating critical habitat was not prudent where it would *increase* the threat of harm to a species. 50 C.F.R. § 424.12(a)(1)(i) (2018). This exemption might apply, for example, where a species is threatened by illegal hunting, and mapping the species' habitat would increase that threat. Second, designating critical habitat was considered not prudent where doing so "would not be beneficial for the species." *Id.* § 424.12(a)(1)(ii) (2018). Relevant factors included "whether the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or whether any areas meet the definition of 'critical habitat.'" *Id.*

46.     In 2019, the Service amended its regulation implementing the "not prudent" exception. The amended regulation, currently in effect, provides five circumstances in which designation might not be prudent:

(i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;

(ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;

(iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

(iv) No areas meet the definition of critical habitat; or

(v) The Secretary otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.

50 C.F.R. § 424.12(a)(1).

47.     Despite specifying additional circumstances under which designation of critical habitat might be "not prudent," the Service and NMFS explained that the amendment was "not intended to expand the circumstances in which the Services determine that designation of critical habitat is not prudent." Final Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020, 45,040 (Aug. 27, 2019); *see also id.* at 45,041 ("[T]he Services anticipate that not prudent findings will remain rare and would be limited to situations in which designating critical habitat would not further the conservation of the species.").

14

**The Administrative Procedure Act**

48.     The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

49.     Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

50.     Moreover, under the APA, an agency must "explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 52 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## STATEMENT OF FACTS

**Life cycle and habitat needs of the rusty patched bumble bee**

51.     The rusty patched bumble bee (*Bombus affinis*) is a unique and prolific pollinator named for the rusty reddish patch on its abdomen. It uses "buzz pollination," meaning it vibrates its body to release pollen from flowers. This technique makes the species a more effective pollinator than honey bees for many native plants, as well as for crops like tomatoes, cranberries, and peppers.

52.     The bee's life cycle shapes the species' habitat needs. Like many species of bumble bee, all workers and male rusty patched bumble bees in a colony

die each fall, leaving a single hibernating queen to carry the colony over to the following year. Queens typically hibernate underground in forested areas near floral resources.

53.     Rusty patched bumble bees are among the first bee species to emerge from hibernation each spring, and among the last to enter hibernation each fall. To survive, the bees collect pollen and nectar from nearby flowers; floral resources must, therefore, be available throughout the species' lengthy active season.

54.     Because many plants flower for only a portion of the bee's active season, the species relies on a broad diversity of flowering plants for sustenance. Floral diversity is especially crucial for the bee because it is a short-tongued species, meaning it can only forage from a subset of plant species with more easily accessible nectar.

55.     In addition, the formation of rusty patched bumble bee colonies is affected by the number of fertile males and whether the landscape is conducive to their dispersal. The bee typically disperses over one kilometer, but the landscape must be "permeable and free of hazards" for males to find and mate with unrelated females with reproductive capacity. U.S. Fish & Wildlife Service, Rusty Patched Bumble Bee (*Bombus affinis*) Species Status Assessment: Final Report, Version 1 17 (2016) (Status Assessment), https://ecos.fws.gov/ServCat/DownloadFile/120109.

56.     Consistent with the bee's life cycle, the Service has identified a number of habitat features that the bee needs to survive. These include "areas that support sufficient food (nectar and pollen), undisturbed nesting habitat in proximity to floral

16

resources, and overwintering habitat for hibernating queens," as well as "a constant and diverse supply of blooming flowers to meet its nutritional needs." 85 Fed. Reg. at 54,282.

57.     In its guidance documents, the Service has outlined the species' habitat needs with even greater specificity. It has identified various habitat categories (e.g., upland grassland and shrubland; palustrine wetlands, excluding ponds), specified the uses that the bee has for each habitat category (i.e., nesting, wintering, foraging), noted seasonal variations in the use of each habitat category (e.g., upland forest and woodland used for foraging in the spring but not summer or fall); and provided examples of discrete habitat types that fall within each habitat category (e.g., "native tallgrass prairie, including remnants and restored/reconstructed native prairie; savanna; [and] pine and oak barrens" are examples of upland grassland and shrubland). U.S. Fish & Wildlife Service, Rusty Patched Bumble Bee (*Bombus affinis*): Endangered Species Act Section 7(a)(2) Voluntary Implementation Guidance, Version 2.1 9 (2019) (Section 7 Guidance), https://bit.ly/3azKHIy. The Service has summarized the bee's habitat needs in the following table in its Section 7 Guidance:

**Table 1.  Seasonal uses of habitat types by the rusty patched bumble bee (RPBB).  Natural or semi-natural vegetation that includes favored forage species (Table 1) typifies RPBB habitat.  The species also uses flower gardens and other areas that contain nectar or pollen resources and are within foraging distance of RPBB habitats.  USFWS assumes that the RPBB is present in nesting habitat between March 16 and October 14 and in wintering habitat from October 15 to March 15.**

| Habitat Category | Habitat Function | | | | Examples/Notes |
|---|---|---|---|---|---|
| | Nesting | Wintering | Foraging | | |
| | | | Spring | Summer/Fall | |
| Upland Grassland & Shrubland | X | | X | X | native tallgrass prairie, including remnants and restored/reconstructed native prairie; savanna; pine and oak barrens |
| Upland Forest & Woodland | | X | X | | Maple-Basswood Forest; Oak-Hickory Forest |
| Upland Forest & Woodland Edges | X | X | X | X | This includes 30-meter edges of forest and woodland habitats that are adjacent to nesting and summer/fall foraging habitat. |
| Palustrine wetlands, excluding ponds | | | X | X | marsh, swamp, bog, fen, and wet meadow; forested wetlands (e.g., Silver Maple - Floodplain Forest) |
| Some vegetation that is not natural or semi-natural – flower gardens and similar areas (e.g., plant nurseries) | | | X | X | Examples of cultural vegetation that provides floral resources; accessed by RPBB from nearby natural and semi-natural areas where they may nest or overwinter |

*Id.* at 9 tbl.1.

58.     One crucial factor for any of this habitat to be usable is that it must
not be contaminated by pesticides, which the Service identified as a key factor in
the bee's decline. Specifically, for habitat to be suitable, it must not be treated or
otherwise contaminated with the insecticides that cause acute harm like death and
subacute harms like disorientation, decreased appetite, and reduced ability to fight
off disease and parasites. In addition, for sufficient forage to be present, the bee
needs flowers, which may be limited or nonexistent in areas where herbicides have
been applied.

**Habitat destruction and degradation threaten the bee's survival and recovery**

59.     The rusty patched bumble bee was once common throughout
grasslands and prairies in much of the Midwest and Northeast United States,

18

ranging northward into Canada. It was found in 29 states, the District of Columbia, and two Canadian provinces.

60.    Since the 1990s, the bee has disappeared from about 87 percent of its historical range; the number of documented populations has similarly declined by at least 88 percent. The colonies and populations (which typically are made up of tens to hundreds of colonies) that remain are subject to continued stress, and many are in poor health.

61.    The bee historically occupied flower-rich grassland and tall-grass prairies throughout its range. Since settlement of the continent by Europeans, an estimated 99.9 percent of grassland in the United States has disappeared.

62.    Much of this habitat loss has occurred as a result of agricultural intensification, fire suppression, and urbanization.

63.    Habitat loss is one of the "primary causes attributed to the decline" of the bee, 82 Fed. Reg. at 3186, and has "established negative effects on bumble bees" generally, 85 Fed. Reg. at 54,283.

64.    Habitat loss and degradation continues to threaten remaining populations of the bee. U.S. Fish & Wildlife Service, Draft Recovery Plan for the Rusty Patched Bumble Bee (*Bombus affinis*) 1 (2019) (Draft Recovery Plan), https://bit.ly/3axYi4v.

65.    It is well-established that habitat loss reduces diversity and abundance of bee species. "Given that several kilos of food are needed to support a single nest, . . . the amount of habitat needed to support a population is likely quite large."

19

Status Assessment 17. This is particularly true for the rusty patched bumble bee, as its colonies are large compared to those of most bumble bee species. *Id.*

66.     The Service has explained that "even slight changes in resource availability could have significant cumulative effects on colony development and productivity," Status Assessment 50. Indeed, "even slight improvements in resource availability could . . . improve the bees' resilience to other stressors, such as pesticides and pathogens," 85 Fed. Reg. at 54,284.

67.     Restoring and maintaining large population sizes is crucial because "smaller populations are inherently more vulnerable to extirpation." Status Assessment 17.

68.     And quantity of habitat alone is not the only important factor for the bee's survival and recovery; habitat quality—including factors like the diversity of floral resources, the degree of contamination by pesticides, and the proximity to areas needed during different life stages—is  significant as well. In addition, habitat connectivity helps existing populations to disperse and locate unrelated mates.

69.     Habitat loss also exacerbates the bee's susceptibility to other ongoing threats, such as pathogens and disease. Bees that lack sufficient habitat may suffer from nutritional deficiencies, decreasing their ability to fight off parasites and disease.

70.     Widespread pesticide use is a major driver of habitat loss and degradation. For example, ubiquitous use of glyphosate, a common herbicide, in agricultural and residential settings has reduced the number of flowering plants

available to pollinators, including the bee. Insecticides similarly impact habitat quality. Neonicotinoid insecticides, for instance, are systemic insecticides that are absorbed by plants, making the entire plant toxic to insects. Bees are then exposed to the potent insecticides through contaminated pollen and nectar, and when this exposure does not kill them outright, it compromises their ability to complete the necessary functions to survive and reproduce.

**Habitat protection is critical to the bee's survival and recovery**

71.     The Service's Draft Recovery Plan for the bee identifies habitat protection as a key component of its recovery and finds that "recovery needs to resemble its natural abundance and distribution to ensure long-term persistence." Draft Recovery Plan 4; *see also* Status Assessment 17 ("Population viability requires healthy demographics and sufficient habitat to support a healthy demography . . . .").

72.     That plan outlines a number of key objectives to "halt[]" and "revers[e]" declines and "ultimately secur[e] the long-term viability of the species." Draft Recovery Plan 3. The first listed objective is to "[p]revent[] further loss of populations," in part, by "improving quality and quantity of habitat" and "ensuring appropriate connectivity between populations.*" Id.* The fourth objective includes "[a]meliorating primary pervasive threats, including . . . habitat loss." *Id.* The fifth is to "[p]rotect[] populations *and their habitats.*" *Id.* (emphasis added). In all, three of the five objectives involve protection or restoration of habitat.

73.     The Draft Recovery Plan also sets out broad categories of actions that are "necessary to achieve the recovery vision for the rusty patched bumble bee." *Id.* at 7. One pillar of the Service's proposed recovery actions is "[m]anag[ing] and protect[ing] habitat." *Id.* at 8. Another is minimizing exposure to pesticides, an important component of which is "habitat restoration or land acquisition." *Id.*

**The Service's delayed approach to the bee's conservation**

74.     In 2013, in response to the bee's dramatic decline, the Xerces Society for Invertebrate Conservation petitioned the Service to list the bee as an endangered species. After two lawsuits by Xerces and Plaintiff NRDC, the Service listed the bee as an endangered species, with protections becoming effective on March 21, 2017.

75.     At the time it listed the bee, the Service did not designate critical habitat, finding that such areas were "not determinable." 82 Fed. Reg. at 3204. Over a year later, past the statutory deadline for designation, the Service still had not made a determination regarding critical habitat.

76.     Instead of implementing the habitat protections contemplated by the ESA and the Service's implementing regulations, the Service developed a map of "high-potential zones" and "low-potential zones" for the bee's conservation. *See* U.S. Fish & Wildlife Service, *Rusty Patched Bumble Bee Map*, http://bit.ly/3aotqSw (last updated Mar. 18, 2021). High-potential zones are those in which the bee is likely to be present. Low-potential zones are "[p]rimary [d]ispersal [z]ones" or "[u]ncertain zones" where the Service concluded the bee is not currently likely to be present. *Id.*

77.     The Service uses these maps, in conjunction with its "Endangered Species Act Section 7(a)(2) *Voluntary* Implementation Guidance," to guide consultation with respect to the bee. *See* Section 7 Guidance (emphasis added).

78.     But neither the maps nor the Service's Section 7 Guidance contains mandatory protections for the bee's *habitat* independent of protections for the bees themselves.

79.     In January 2019, Plaintiff NRDC sued the Service to challenge its failure to designate critical habitat or make a "not prudent" finding for the bee. That lawsuit resulted in a settlement agreement between NRDC and the Service, which required the Service either to publish a proposed rule designating critical habitat, or determine that designation is not prudent, by July 31, 2020.

**The Service's "not prudent" decision**

80.     On September 8, 2020, the Service published in the Federal Register its determination that designating critical habitat for the bee would be not prudent. In making this determination, the Service invoked the current version of its regulation implementing the ESA's "not prudent" exception. *See* 50 C.F.R. § 424.12(a)(1). The Service did not rely on any of the first four subsections of this regulation; nor did it explain that designating critical habitat would not benefit the bee. Rather, the Service relied on the fifth subsection (the "catch-all provision") to "otherwise determine[] that designation of critical habitat would not be prudent based on the best scientific data available." *Id*. § 424.12(a)(1)(v); *see* 85 Fed. Reg. at 54,284.

23

81.     The Service justified its finding on three asserted bases: 1) "the present or threatened destruction, modification, or curtailment of the rusty patched bumble bee's habitat or range is not the primary threat to the species;" 2) "availability of habitat does not limit the conservation of the rusty patched bumble bee now, nor will it in the future;" and 3) the Service "cannot predict which specific areas rusty patched bumble bees may occupy at a landscape level across its historic range." 85 Fed. Reg. at 54,284.

82.     Though the Service determined that its current regulations apply, it also provided an alternative justification under its prior regulations. Assuming that the prior regulations applied, the Service found that designating critical habitat would not be prudent because it "would not be beneficial for the species." *Id*.

83.     The Service supported this alternative justification with three assertions: 1) "the present or threatened destruction, modification, or curtailment of the rusty patched bumble bee's habitat or range is not the primary threat to the species;" 2) "availability of habitat does not limit the conservation of the rusty patched bumble bee now, nor will it in the future;" and 3) section 7 consultation for unoccupied habitat is not necessary, and the Service has "achieved, through development of the priority maps, the other benefits of critical habitat that we had identified in the final listing rule [i.e., benefits other than section 7 consultation]." *Id*. These "other benefits" include "focusing conservation activities on the most essential areas to prevent further loss of colonies, providing educational benefits by

creating greater public awareness of rusty patched bumble bee and its conservation, and preventing inadvertent harm to the species." *Id.*

84.     Plaintiffs challenge the legal and factual bases of both the Service's primary and alternative justifications for its failure to designate critical habitat for the bee.

## CLAIMS FOR RELIEF

## Claim 1: The Service's application of the "not prudent" exception violates the ESA and APA

85.     Plaintiffs incorporate by reference all preceding paragraphs in this complaint.

86.     The ESA requires the Service to designate the bee's critical habitat "to the maximum extent prudent." 16 U.S.C. § 1533(b)(6)(C)(ii). The statute authorizes the Service to withhold designation as "not prudent" only in narrow circumstances where designation would not benefit the bee.

87.     Applying the current version of its regulations at 50 C.F.R. § 424.12(a), the Service determined—without finding a lack of benefit for the bee—that designation of critical habitat would be "not prudent." The Service's application gives unprecedented and unlawful breadth to the "not prudent" exception and cannot be reconciled with Congress's intent.

88.     The Service's decision not to designate critical habitat based on this application of the "not prudent" exception therefore violates the ESA, 16 U.S.C. § 1533(b)(6)(C), and is "not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A).

**Claim 2: The Service failed to use the best available science to designate critical habitat for the bee, in violation of the ESA, the Service's current regulation at 50 C.F.R. § 424.12(a), and the APA**

89.     Plaintiffs incorporate by reference all preceding paragraphs in this complaint.

90.     The ESA mandates that the Service use the "best scientific and commercial data *available*" to identify and designate critical habitat. 16 U.S.C. § 1533(b)(2) (emphasis added); *see also* 50 C.F.R. § 424.12(a). Moreover, the ESA required the Service to designate critical habitat "to the maximum extent prudent," "based on such data as may be available." 16 U.S.C. § 1533(b)(6)(C)(ii).

91.     The Service nonetheless found designating critical habitat to be "not prudent" because it claimed there was insufficient information about the bee's habitat needs to predict where it might be found. *See* 85 Fed. Reg. at 54,284.

92.     Even if more information could be provided to guide designation of critical habitat for the bee, this cannot justify the Service's "not prudent" decision. Ample information exists to allow the Service to identify and designate critical habitat for the bee. The Service's failure to designate critical habitat based on the best available scientific and commercial data violated the ESA, the Service's regulation, and the APA.

**Claim 3: The Service's application of the "not prudent" exemption violates its current regulation at 50 C.F.R. § 424.12(a)(1) and the APA**

93.     Plaintiffs incorporate by reference all preceding paragraphs in this complaint.

94.     The Service relied on the current version of its regulation implementing the ESA's "not prudent" exception as the legal basis for withholding critical-habitat designation for the bee. *See* 50 C.F.R. § 424.12(a)(1).

95.     Section 424.12(a)(1) has five subsections, each of which enumerates a circumstance under which designation of critical habitat might be "not prudent." *See id.* § 424.12(a)(1)(i)-(v). None of these subsections—including the catch-all provision that authorizes the Service to "otherwise determine[] that designation of critical habitat would not be prudent based on the best scientific data available," *id*. § 424.12(a)(1)(v)—allows the Service to make a "not prudent" determination where designation would benefit a species.

96.     Nevertheless, relying on the catch-all provision, the Service made a "not prudent" determination without finding that it could not benefit the bee.

97.     The Service's application of the catch-all provision exceeds regulatory limits and would allow that provision to swallow the remainder of the rule. The Service's decision therefore violates its current regulation at section 424.12(a)(1) and is "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A).

**Claim 4: The Service's application of the "not prudent" exception is arbitrary and capricious, in violation of the ESA, its current regulation at 50 C.F.R. § 424.12(a)(1), and the APA**

98.     Plaintiffs incorporate by reference all preceding paragraphs in this complaint.

99.     Applying the catch-all provision of its current regulation, 40 C.F.R. § 424.12(a)(1)(v), the Service offered three factual justifications for its

determination that designating critical habitat would be not prudent. None of these justifications establish a lack of benefit from designation.

100.    Even if the ESA and the Service's current regulation implementing the "not prudent" exception allow the Service to withhold critical-habitat designation for reasons other than lack of (more than de minimis) benefit to the bee or absence of habitat that meets the definition of critical habitat, the Service's application of the "not prudent" exception is arbitrary and capricious.

101.    First, each of the Service's three justifications contradicts information in the record, including the Service's own previous conclusions about threats to the bee's survival and recovery. The Service's justifications thus "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

102.    Furthermore, none of the Service's justifications can be squared with the ordinary meaning of the term "prudent" or information in the record indicating that habitat protections are important, and even necessary, to the bee's survival and recovery. The Service's justifications therefore fail to "offer a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 52 (quoting *Burlington*, 371 U.S. at 168).

103.    And even assuming only one or two of the Service's justifications contradicts record evidence, or otherwise fails to link that evidence to the Service's "not prudent" finding in a rational manner, there is no indication that the Service would have reached the same determination absent any one of its three justifications.

104.    The Service's reliance on the "not prudent" exception to withhold critical-habitat designation for the bee is therefore arbitrary and capricious in violation of the ESA, the Service's current regulation at 50 C.F.R. § 424.12(a)(1), and the APA.

### Claim 5: The Service's alternative justification violates the ESA, its prior regulation at 50 C.F.R. § 424.12(a)(1) (2018), and the APA

105.    Plaintiffs incorporate by reference all preceding paragraphs in this complaint.

106.    The Service's determination was made pursuant to its current regulation at 50 C.F.R. § 424.12(a)(1). *See* 85 Fed. Reg. at 54,284.

107.    Nevertheless, the Service made an alternative finding under its prior regulation at 50 C.F.R. § 424.12(a)(1) (2018), concluding that critical-habitat designation would be not prudent because it would not benefit the bee.

108.    Should the Court determine that the prior regulation applies, the Service's alternative "no benefit" finding: is contradicted by record evidence that protecting habitat would facilitate the bee's survival and recovery; is not based on the best available data; is not rationally connected to the evidence before the agency; rests on a legally flawed premise that Section 7 consultation to avoid destruction or adverse modification of critical habitat offers no benefit beyond consultation to avoid jeopardy to a species; and/or relies on considerations other than whether critical-habitat designation would benefit the bee—the sole relevant factor that the ESA and the Service's regulation authorized the Service to consider.

29

109.    Accordingly, if the Service's prior regulation applies, then the Service's decision violates the ESA, the prior regulation, and the APA.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment as follows:

A.    Declare that the Service's decision not to designate critical habitat for the bee violated the ESA, APA, and/or the Service's current regulation at 50 C.F.R. § 424.12(a)(1);

B.    In the alternative, declare that the Service's decision not to designate critical habitat for the bee violated the ESA, APA, and/or the Service's prior regulation at 50 C.F.R. § 424.12(a)(1) (2018);

C.    Set aside the Service's decision not to designate critical habitat for the bee;

D.    Direct the Service to propose designating critical habitat for the bee, and to finalize the proposed designation of critical habitat, within one year of the entry of judgment;

E.    Award Plaintiffs their costs and reasonable attorneys' fees; and

F.    Grant such other relief that the Court considers just and proper.

Respectfully submitted this 24th day of March, 2021.

By:   */s/ Lucas Rhoads*
LUCAS J. RHOADS (DC Bar No. 252693)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel. (202) 513-6242
lrhoads@nrdc.org

MARGARET HSIEH (*pro hac vice pending*)
Natural Resources Defense Council
40 W. 20th Street, 11th Floor
New York, NY 10011
Tel. (212) 727-2700
mhsieh@nrdc.org

*Counsel for NRDC and FMSNA*



 /s/ Ryan Adair Shannon
RYAN ADAIR SHANNON
(DC Bar No. OR0007)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
Tel. (971) 717-6407
rshannon@biologicaldiversity.org

*Counsel for the Center for Biological Diversity*