## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
                                    )
NATURAL RESOURCES                   )
DEFENSE COUNCIL, INC., et al.,      )
                                    )
              Plaintiffs,           )
                                    )
       v.                           )        Civil Action No. 21-0770 (ABJ)
                                    )
U.S. FISH AND                       )
WILDLIFE SERVICE, et al.,           )
                                    )
              Defendants.           )
                                    )
```

## <u>MEMORANDUM OPINION</u>

Plaintiffs Natural Resources Defense Council, Inc. ("NRDC"), Center for Biological Diversity ("CBD"), and Friends of Minnesota Scientific and Natural Areas ("FMSNA") brought this action on March 24, 2021 under the Endangered Species Act ("ESA"), 16 U.S.C. § 1533 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq.*, seeking to compel defendants United States Fish and Wildlife Service ("FWS" or the "Service"), the Acting Director of FWS, Martha Williams, and the United States Department of the Interior ("Interior") to designate critical habitat for the endangered rusty patched bumble bee.[1]  Compl. ¶¶ 1, 85–109.

On December 6, 2021, plaintiffs filed a motion for summary judgment.  Pls.' Mot. for Summ. J., Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 19] ("Pls.' Mot.").  Their motion is supported by seven declarations from NRDC and CBD members, each one attesting to their interest in preserving the bee's habitat.  *See* Decl. of Clay Bolt [Dkt. # 19-1] ("Bolt Decl."); Decl. of Jason Taylor [Dkt. # 19-2] ("Taylor Decl."); Decl. of Gina Trujillo [Dkt. # 19-3] ("Trujillo

---

1        FWS operates under the jurisdiction of Interior.  Compl. [Dkt. # 1] ¶ 25.

Decl."); Decl. of Thomas E. Casey [Dkt. # 19-4] ("Casey Decl."); Decl. of David Noah Greenwald [Dkt. # 19-5] ("Greenwald Decl."); Decl. of Andrew Wedel [Dkt. # 19-6] ("Wedel Decl."); Decl. of Bryan P. Newman [Dkt. # 19-7] ("Newman Decl.").

Defendants opposed plaintiffs' motion and filed a cross-motion for summary judgment. Fed. Defs.' Cross-Mot. for Summ. J., Mem. of P. & A. in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. and in Opp. to Pls.' Mot. [Dkt. # 20] ("Defs.' Mot.").[2] Plaintiffs also oppose defendants' motion. Pls.' Combined Reply in Supp. of Summ. J. and Opp. to Defs.' Mot. [Dkt. # 24] ("Pls.' Reply").[3] The motions are fully briefed. *See* Fed. Defs.' Reply in Supp. of Defs.' Mot. [Dkt. # 26] ("Defs.' Reply").

For the reasons set forth below, the Court will **GRANT** plaintiffs' motion and **DENY** defendants' cross-motion.

## BACKGROUND

### I.    Statutory Background

Under the Endangered Species Act, when a species is placed on the "List of Endangered and Threatened Wildlife," the Secretary of the Interior "shall concurrently . . . designate any habitat of such species which is then considered to be critical habitat" "to the maximum extent prudent

---

[2]    Defendants' opposition to plaintiffs' motion and cross-motion for summary judgment also appears at Dkt. # 21.

[3]    Plaintiffs' combined reply in support of summary judgment and opposition to defendants' motion for summary judgment also appears at Dkt. # 25.  Plaintiffs attached five supplemental declarations to this submission from members of their organizations whose "interests in viewing the bee are also threatened by the Service's Not-Prudent Decision."  Pls.' Reply at 40; *see* Decl. of Lucas Rhoads [Dkt. # 24-1] ("Rhoads Decl."); Decl. of Nicole Vandal [Dkt. # 24-2] ("Vandal Decl."); Decl. of Clay Bolt [Dkt. # 24-3] ("Suppl. Bolt Decl."); Decl. of Thomas E. Casey [Dkt. # 24-4] ("Suppl. Casey Decl."); Decl. of Jason Taylor [Dkt. # 24-5] ("Suppl. Taylor Decl.").

and determinable."  16 U.S.C. § 1533(a)(3)(A) (comma omitted).  The statute defines "critical

habitat" for an endangered species as:

> (i)  the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii)  specific areas outside the geographical area occupied by the species at the time it is listed [("unoccupied habitat")]. . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

The Secretary may extend the statutory deadline for the critical habitat designation by one

year if:

> (i)  it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or
>
> (ii)  critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the [period] . . . by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

16 U.S.C. § 1533(b)(6)(A).

In 2016, FWS promulgated a regulation outlining the criteria for designating critical

habitat.  It reiterated that it would "propose and finalize critical habitat designating concurrent with

issuing proposed and final listing rules" "[t]o the maximum extent prudent and determinable."

50 C.F.R. § 424.12(a).  But the regulation also specified that a critical habitat designation would

not be prudent when:

> (i)  The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species; [or]

<blockquote>
(ii) Such designation of critical habitat would not be beneficial to the species.  In determining whether a designation would not be beneficial, the factors the Service[] may consider include but are not limited to: Whether the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or whether any areas meet the definition of "critical habitat."
</blockquote>

50 C.F.R. § 424.12(a)(1) (2016) ("2016 Regulation").[4]

If, after considering "the best scientific data available," and "the probable economic, national security, and other relevant impacts of making a [critical habitat] designation,"

_____

4      In 2019, FWS amended the regulation and specified additional circumstances in which a critical habitat designation would not be prudent.  This version of the regulation said that the Secretary may determine that a designation would not be prudent when:

<blockquote>
(i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;

(ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions . . . . ;

(iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

(iv) No areas meet the definition of critical habitat; or

(v) The [Service] otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.
</blockquote>

50 C.F.R. § 424.12(a)(1) (2019) ("2019 Regulation"); *See* J. A. [Dkt. # 27] ("Admin. R.") at RPBB0007.  The amended regulation applies "only to relevant rulemakings for which the proposed rule is published after that date [September 27, 2019]."  Admin. R. at RPBB0007.

Even though the Service initially analyzed whether habitat should be designated under both versions of the regulation, the parties now agree that the 2016 Regulation applies because the proposed rule was published before the September 2019 effective date.  *See* Pls.' Mot. at 23 ("Plaintiffs here explain that the Service should have applied the 2016 Regulation"); Defs.' Mot. at 7 n.2 ("the parties agree that the 2019 Regulations do not apply").

50 C.F.R. § 424.12(a) (2016); 50 C.F.R. § 424.12(a) (2019), the Secretary determines that a species' habitat is "critical," then "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

## II.    Factual Background

On January 11, 2017, FWS issued a final rule adding the rusty patched bumble bee (*Bombus affinis*) to the "List of Endangered and Threatened Wildlife" and finding that the bee was "presently in danger of extinction throughout its entire range."[5]   Endangered and Threatened Wildlife and Plants; Endangered Species Status for Rusty Patched Bumble Bee, 82 Fed. Reg. 3186, 3205 (Jan. 11, 2017) ("Final Rule").[6]

The Final Rule explained that historically, the bee was distributed across the eastern and Midwestern United States and Ontario, Canada.  82 Fed. Reg. at 3186; Admin. R. at RPBB0125. The species "has been observed and collected in a variety of habitats, including prairies, woodlands, marshes, agricultural landscapes, and residential parks and gardens . . . ." 82 Fed. Reg. at 3187; Admin. R. at RPBB0126.  The bee requires a habitat with "sufficient food (nectar and pollen from diverse and abundant flowers), undisturbed nesting sites in proximity to floral resources, and overwintering sites for hibernating queens."  82 Fed. Reg. at 3187; Admin. R. at RPBB0126.  The species lives in temperate climates and is unlikely "to survive prolonged periods

---

5      FWS's proposed rule was published on September 22, 2016.  *See* Admin. R. at RPBB0154.

6      The Final Rule is also included in the Administrative Record.  *See* Admin. R. at RPBB0125.

of high temperatures" over 95 degrees Fahrenheit. 82 Fed. Reg. at 3187; Admin. R. at RPBB0126. "Since the late 1990s, rusty patched bumble bee abundance and distribution has declined significantly." 82 Fed. Reg. at 3188; Admin. R. at RPBB0127.

The Final Rule also explained that "[t]he losses in both the number of populations and spatial extent render the rusty patched bumble bee vulnerable to extinction even without further external stressors (*e.g.*, habitat loss, insecticide exposure) acting upon the species." 82 Fed. Reg. at 3188; Admin. R. at RPBB0127. But the species did in fact face a number of primary stressors, "including pathogens, pesticides, habitat loss and degradation, small population dynamics, and effects of climate change." 82 Fed. Reg. at 3189; Admin. R. at RPBB0128. As pertains to habitat loss and degradation, the Final Rule said:

> The rusty patched bumble bee historically occupied native grasslands of the Northeast and upper Midwest; however, much of this landscape has now been lost or is fragmented. Estimates of native grassland losses since European settlement of North America are as high as 99.9 percent . . . . Habitat loss is commonly cited as a long-term contributor to bee declines through the 20th century, and may continue to contribute to current declines, at least for some species . . . . However, the rusty patched bumble bee may not be as severely affected by habitat loss compared to habitat specialists, such as native prairie endemics, because it is not dependent on specific plant species, but can use a variety of floral resources. Still, loss or degradation of habitat has been shown to reduce both bee diversity and abundance . . . . Large monocultures do not support the plant diversity needed to provide food resources throughout the rusty patched bumble bees' long foraging season, and small, isolated patches of habitat may not be sufficient to support healthy bee populations . . . .
>
> Although habitat loss has established negative effects on bumble bees . . . , many researchers believe it is unlikely to be a main driver of the recent, widespread North American bee declines . . . . However, the past effects of habitat loss and degradation may continue to have impacts on bumble bees that are stressed by other factors. If there is less food available or if the bumble bees must expend more energy and time to find food, they are less healthy overall, and thus less resilient to other stressors (for example, nutritional stress may decrease the ability to survive parasite infection . . . or cope with pesticides . . . ). Furthermore, bumble bees may be more vulnerable to extinction than other animals because their colonies have long

> cycles, where reproductive individuals are primarily produced near the end
> of those cycles.  Thus, even slight changes in resource availability could
> have significant cumulative effects on colony development and productivity
> . . . .

82 Fed. Reg. at 3190; Admin. R. at RPBB0129.  In part because of "[h]abitat loss and degradation,"

the Final Rule concluded that the species was vulnerable to extinction.  82 Fed. Reg. at 3205;

Admin. R. at RPBB0144.[7]

In the Final Rule, the Service did not designate critical habitat for the bee.  Rather, it said

that the question of whether this designation was prudent was "not determinable at this time."

82 Fed. Reg. at 3207; Admin. R. at RPBB0146.  It noted, though, that "[b]ecause designation of

critical habitat will not likely increase the degree of threat to the species and may provide some

measure of benefit, designation of critical habitat may be prudent for the rusty patched bumble

bee."  82 Fed. Reg. at 3206; Admin. R. at RPBB0145.

More than three years later, on September 1, 2020, FWS published a "notice of final

determination," concluding that designating critical habitat for the bee would not be prudent.[8]

Endangered and Threatened Wildlife and Plants; Determination That Designation of Critical

Habitat is Not Prudent for the Rusty Patched Bumble Bee, 85 Fed. Reg. 54281 (Sept. 1, 2020)

---

7       The Service also discussed the threat of habitat loss in the 2019 Draft Recovery Plan for
Rusty Patched Bumble Bee.  *See* Admin. R. at RPBB0041.  This Draft was prepared by the Service
to "delineate reasonable actions that are believed necessary to recovery or [to] protect the species,"
but did not impose any obligations on parties or represent official Service positions.  Admin. R. at
RPBB0042.  The Draft discussed the need to prevent further loss of bee populations by "improving
quality and quantity of habitat" and "ensuring appropriate connectivity between populations."
Admin. R. at RPBB0045.

8       In this notice, the Service discussed whether the 2016 or 2019 version of the regulation that
outlined the criteria for designating critical habitat applied to the bee's critical habitat designation.
It found that "designation of critical habitat is not prudent" under the 2019 version, but "even if
we were to apply the regulations in place at the time of listing at 50 CFR 424.12(a)(1) [the 2016
version], we would still conclude that designating critical habitat is not prudent for the rusty
patched bumble bee."  85 Fed. Reg. at 54284–85; Admin. R. at RPBB0004–05.

("critical  habitat  designation").[9]   The  Service  explained  that  "[t]he  present  or  threatened destruction, modification, or curtailment of habitat is not the primary threat to the species, and the availability of habitat does not limit the conservation of the rusty patched bumble bee now, nor will it in the future."  85 Fed. Reg. at 54281; Admin. R. at RPBB0001.  Rather, the Service said, "[b]ecause habitat for the rusty patched bumble bee is not limiting, and because the bee is considered to be flexible with regard to its habitat use for foraging, nesting, and overwintering, the availability of habitat does not limit the conservation of the rusty patched bumble bee now, nor will it in the future."  85 Fed. Reg. at 54284; Admin. R. at RPBB0004.  The Service pointed to "pesticides and pathogens" as the bee's "primary stressors," 85 Fed. Reg. at 54284; Admin. R. at RPBB0004, and determined that the "species' dispersal abilities, and the variety of habitats it can use for foraging, overwintering, and nesting . . . indicate that designation of critical habitat is not prudent."  85 Fed. Reg. at 54284; Admin. R. at RPBB0004.[10]

Further, FWS noted that

> [s]ince the time of listing, we have developed a rusty patched bumble bee map, posted on our website, that shows where the rusty patched bumble bee may be present . . . .  The map identifies three areas: (1) "High potential zones" (HPZs) where [the] rusty patched bumble bee is likely present, (2) "low potential zones" where [the] rusty patched bumble bee is not likely to be present, and (3) the species' historical range where [the] rusty patched bumble bee is not present.
>
> . . . .
>
> Since the time of listing, we have developed section 7 consultation guidance, which focuses on avoiding direct impacts to rusty patched bumble bees and their occupied habitat . . . .  The consultation guidance directs

_____

9       The critical habitat designation is also included in the Administrative Record.  *See* Admin. R. at RPBB0001.

10      The Service also stated that it could not "predict which specific areas [the] . . . bees may occupy at a landscape level across its historic range." 85 Fed. Reg. at 54284; Admin. R. at RPBB0004.  These conclusions appear to have been made, though, in considering the relevant factors under the 2019 regulation.

> Federal agencies to assess potential effects to rusty patched bumble bee[s] from activities occurring in suitable habitat within the HPZs.  We have determined that consultation outside of these zones, in unoccupied habitat, is not necessary because it is unlikely that the species is using those areas.  Although we identified section 7 consultation in unoccupied areas as a potential benefit of designating critical habitat, we have found since then that consultation in those areas is not necessary for the conservation of the species.
>
> . . . .
>
> Because these maps are updated regularly as we receive new information, they provide better, more focused attention to the needs of rusty patched bumble bee[s] than a static critical habitat designation would.

85 Fed. Reg. at 54283–84; Admin. R. at RPBB0003–04.

Plaintiffs challenge the Service's decision not to designate critical habitat for the rusty patched bumble bee under the ESA and APA.  Compl. ¶¶ 85–109.  They argue that the decision was arbitrary and capricious, and request that the Court set it aside and "[d]irect the Service both to propose and finalize a designation of critical habitat for the bee, based on the best available information and to the maximum extent prudent."  Pls.' Mot. at 45; *id.* at 3; *see also* Compl. at 30; Pls.' Reply at 44.  They maintain that the ESA only authorizes the Service to withhold a critical habitat as "not prudent" in narrow circumstances when designation would not be beneficial to a species, but here, the Service has not established that the bee would not benefit from the designation.  Pls.' Mot. at 25–32.  Further, they argue that the Service failed to explain how its decision is supported by the record.  *Id.* at 32–38.

The federal defendants move for judgment in their favor on the grounds that plaintiffs lack standing to bring suit because they failed to demonstrate that any injury in fact is traceable to the challenged decision and would be redressed by judicial relief.  Defs.' Mot. at 8–13.  And even if plaintiffs have standing, defendants maintain that the critical habitat designation is reasonable and supported by the record.  *Id.* at 13–28.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of final agency action under the APA, Rule 56 does not apply due to "the limited role of a court in reviewing the administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177, 1177 n.28 (D.C. Cir. 1977).

Further, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). However, the scope of review under the APA is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is generally presumed to be valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks omitted).

# ANALYSIS

## I.      Standing

To establish their standing to bring this action, plaintiffs must show three things: that they have suffered an injury in fact, that is, "an actual or imminent invasion of a legally protected, concrete and particularized interest;" that there is a causal connection between the alleged injury and the conduct at issue; and that it is likely, and not merely speculative, that the Court can redress the injury. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005), citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs must demonstrate standing for each claim they assert. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (holding that "a plaintiff must demonstrate standing separately for each form of relief sought"). "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014), citing *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).

Organizations such as plaintiffs may assert standing on their own behalf under certain circumstances or they may seek representational standing on behalf of their members. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11–12 (D.C. Cir. 2011). Plaintiffs here claim only representational standing, *see* Pls.' Reply at 33 n.13 ("Plaintiffs assert representational or 'associational' standing on behalf of their members, not 'organizational' standing."), so the Court will not address organizational standing.

To have representational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Ass'n of Home Builders*, 667 F.3d

at 12, quoting *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) and *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996).

Plaintiffs sue on behalf of their members. *See* Pls.' Mot. at 42. According to plaintiffs, the "second requirement is satisfied because protection of the environment, including endangered species like the bee, is central to each organization's purpose." *Id.* at 43, citing Trujillo Decl. ¶¶ 4– 5; Casey Decl. ¶ 1; Greenwald Decl. ¶¶ 3–4. They also contend that the third requirement is satisfied because their "claims and requested relief – an order setting aside the Service's decision – 'obviously' do not require individual members' participation." *Id.*, quoting *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 273 (D.C. Cir. 1988). The defendants do not appear to contest that plaintiffs have met these requirements. *See* Defs.' Mot. at 8–13; Defs.' Reply at 1–8.

To establish the first requirement – that members would have standing to sue in their own right – the organization "must demonstrate that the member has incurred [1] an actual or imminent injury in fact, [2] fairly traceable to the challenged agency action, [3] that will likely be redressed by a favorable decision." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013), quoting *N.Y. Reg'l Interconnect v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) (internal quotation marks omitted). At the summary judgment stage, plaintiffs "must support each of these elements by affidavit or other evidence, and their burden of proof is not to demonstrate certainty but to show a substantial probability that each of these elements has been met." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (internal quotation marks and emphasis omitted). Defendants argue that plaintiffs cannot demonstrate any of these three elements because they "fail to point to anything in the administrative record or in the declarations submitted with their motion for summary judgment which demonstrates that any member of their organizations has suffered an

'injury in fact' traceable to the Critical Habitat Determination which can be redressed by a favorable ruling from this Court." Defs.' Mot. at 9.[11]

## A.    Actual or Imminent Injury in Fact

"An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.   An injury is particularized if it affects the party asserting standing in a personal and individual way." *Perciasepe*, 714 F.3d at 1323, quoting *Lujan*, 504 U.S. at 560, 560 & 560 n.1 (internal quotation marks and citations omitted); *see Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (holding that the plaintiffs' concern that climate change would impact wildlife was too generalized and speculative to be concrete, imminent injury).   In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by "aver[ring] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."   *Laidlaw Env't Servs.*, 528 U.S. at 183 (internal quotation marks omitted).   But plaintiffs must also provide a "description of concrete plans," which includes establishing that they will "use the area affected by the challenged activity and not an area roughly in the vicinity of it," and when.   *Lujan*, 504 U.S. at 564–66 (internal quotation marks omitted).

Plaintiffs assert that their members "have significant aesthetic, recreational, economic, and professional interests in searching for and viewing the rusty patched bumble bee in its habitat." Pls.' Mot. at 43, citing Casey Decl. ¶¶ 6–10, 13; Bolt Decl. ¶¶ 5–14; Taylor Decl. ¶¶ 4–12; Newman Decl. ¶¶ 5, 7, 9, 11, 15; Wedel ¶¶ 3–9; Greenwald Decl. ¶¶ 7–9; Pls.' Reply at 36.   They point to the following injuries:

11     In 2014, plaintiffs The Xerces Society for Invertebrate Conservation and the NRDC, both non-profit environmental advocacy organizations, brought suit against Interior and the Service to list the rusty patched bumble bee as an endangered species pursuant to the Endangered Species Act. *See The Xerces Soc'y for Invertebrate Conservation v. Jewell*, Case No. 14-cv-0802, Compl. [Dkt. # 1] ¶¶ 1, 10 (D.D.C. May 13, 2014). In their complaint, they alleged that:

> Xerces Society members regularly observe, visit, study, work to protect, eat and enjoy plants pollinated by, and delight in the rusty patched bumble bee in the wild, and intend to continue doing so in the future. Xerces Society members derive scientific, educational, recreational, conservation, aesthetic, nutritional, and other benefits from the existence of rusty patched bumble bees in the wild.
>
>        . . . .
>
> NRDC members regularly observe, visit, study, work to protect, eat and enjoy plants pollinated by the rusty patched bumble bee, and delight in the bee's presence in the wild. NRDC members intend to continue doing so in the future. NRDC members derive scientific, educational, recreational, conservation, aesthetic, nutritional, and other benefits from the existence of rusty patched bumble bees in the wild.

*Id.* ¶¶ 11, 13. The federal defendants did not argue that plaintiffs lacked standing to bring these claims. *See The Xerces Soc'y for Invertebrate Conservation v. Jewell*, Case No. 14-cv-0802, Fed. Defs.' Answer [Dkt. # 10] (D.D.C. Sept. 3, 2014).

Interior and the Service also did not move to dismiss a separate action brought by NRDC, which challenged their failure to publish a final rule designating critical habitat for the rusty patched bumble bee. *See NRDC v. Bernhardt*, Case No. 19-cv-0078, Compl. [Dkt. # 1] (D.D.C. Jan. 15, 2019); *NRDC v. Bernhardt*, Case No. 19-cv-0078, Defs.' Answer [Dkt. # 14] (D.D.C. Apr. 24, 2019). The complaint in that case alleged that NRDC's members "regularly seek out and enjoy the rusted patched bumble bee in its natural habitat," and specifically refers to NRDC member Clay Bolt's ability to enjoy those benefits. *NRDC v. Bernhardt*, Case No. 19-cv-0078, Compl. ¶ 11 (D.D.C. Jan. 15, 2019).

Defendants argue that "no 'failure to regulate' has been alleged here," and "[i]nstead, [p]laintiffs challenge the Service's substantive scientific conclusions in its Critical Habitat Determination." Defs.' Reply at 4. While that distinguishes this case from the 2014 and 2019 actions involving procedural injuries, the difference does not fundamentally alter the standing analysis applicable to all three. *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) ("Because the Supreme Court . . . considered the 'particularized injury' as the normal focus of standing analysis even in procedural-rights cases, [the district court] must examine the causal connection between the substantive government action and the asserted injury to the plaintiff's particularized interest.").

- <u>Clay Bolt</u>: A member of NRDC[12] and a professional natural history and conservation photographer, Bolt avers that "[a] significant part of [his] work has focused specifically on the rusty patched bumble bee." Bolt Decl. ¶¶ 1, 3, 5. He has photographed the bee, and wrote and produced a documentary film about the bee. *Id.* ¶¶ 6–7. Bolt last saw the bee in Wisconsin in 2018; since then, he has looked for the bee in Minneapolis, southern Appalachia, and parts of Illinois, and has not found it. *Id.* ¶ 11. He declared that he plans to visit the Bell Bowl Prairie in Rockford, Illinois, an "extremely rare gravel hill prairie habitat[ that] is threatened with complete destruction as a result of the proposed expansion of Chicago Rockford International Airport." *Id.* ¶ 14. In his declaration, Bolt expressed that "it would be incredibly painful to me to no longer be able to go out and photograph the bee and spend time with it. I am concerned that without critical habitat for the species, my continued ability to see and photograph the bee is in danger." *Id.* ¶ 18. Bolt submitted a supplemental declaration "to express additional concerns about the effects of the Service's failure to designate critical habitat for the bee," and specifically as pertains to the continued use of neonicotinoid pesticides in the area around the Bell Bowl Prairie that he avers are "likely harming the bee, reducing the quality of its habitat and my ability to see the bee there in the future." Suppl. Bolt Decl. ¶¶ 2, 6.

- <u>Jason Taylor</u>: A member of NRDC[13] and the Executive Director of the Bur Oak Land Trust in Johnson County, Iowa, Taylor avers that he has been "developing a variety of projects to protect the rusty patched bumble bee," which he has observed in his yard. Taylor Decl. ¶¶ 1, 3, 7. He "derive[s] aesthetic, personal, professional, economic, and recreational benefits from the bee and its habitat," and is "concerned that continued failure to designate critical habitat for the . . . bee will decrease the bee's chances of survival and recovery. *Id.* ¶¶ 12–13. In his supplemental declaration "express[ing] additional concerns about the effects of the Service's failure to designate critical habitat for the bee," he details his concerns about the use of pesticides, including neonicotinoids, that threaten the bee and can spread from the fields where they are applied. Suppl. Taylor Decl. ¶¶ 2, 3, 8. He believes that if the Land Trust's properties are designated as critical habitat, it will increase the likelihood that the bee will persist. *Id.* ¶¶ 5, 10.

- <u>Thomas E. Casey</u>: A member of the FMSNA and an amateur photographer from Minnesota, Casey often looks for the bee. Casey Decl. ¶¶ 1, 4, 6. He attests that the Service's decision could affect the bee and its habitat in the Minnesota Valley National Wildlife Refuge: "I am concerned that the

---

12    Gina Trujillo, the director of Membership at NRDC, avers that Bolt is a current member of NRDC. Trujillo Decl. ¶¶ 1, 8.

13    In Trujillo's declaration, she also avers that Taylor is a current member of NRDC. Trujillo Decl. ¶ 8.

Service's failure to designate any critical habitat makes it likely that management activities would inadvertently harm the bee's habitat and, therefore, reduce my likelihood of seeing and enjoying the bee within the Refuge." Casey Decl. ¶ 12.  In his supplemental declaration, he states his concern that ongoing projects at the refuge may harm the bee's habitat – but "if critical habitat were designated for the rusty patched bumble bee in the Refuge, these [projects] would need to be analyzed for their potential impacts to the bee's habitat." Suppl. Casey Decl. ¶ 6.

- ▪ <u>David Noah Greenwald</u>: A member of CBD, Greenwald attests that he "personally derive[s] scientific, aesthetic, and spiritual benefits from the continued existence of the rusty patched bumble bee in the wild and from the habitats upon which it depends." Greenwald Decl. ¶¶ 2, 7.  He avers that he would "suffer professional, aesthetic, spiritual, and recreational injuries from the inability to observe and appreciate the rusty patched bumble bee in the wild.  My knowledge and observation of the decline of the rusty patched bumble bee and the loss of its habitat has weighed on my mind and detracted from my enjoyment of areas in Minnesota and other areas within the bees' current and historic range." *Id.* ¶ 10.

- ▪ <u>Andrew Wedel</u>: A member of CBD, Wedel avers that he has "strong aesthetic, recreational, and economic interests in the rusty patched bumble bee." Wedel Decl. ¶¶ 2, 3.  His family owns 600 acres of land in southwestern Wisconsin, where he travels and looks for the bee. *Id.* ¶¶ 3, 4.  "Loss of the habitat for the bee would reduce the value of this property significantly," according to Wedel, "since its primary economic value resides in the value it holds for the many people who enjoy this vibrant ecosystem." *Id.* ¶ 6.

- ▪ <u>Bryan P. Newman</u>: A member of CBD and an amateur naturalist, Newman lives in Minnesota near where the bee has been found.  Newman Decl. ¶¶ 2–4.  He has taken several trips to look for the bee in other parts of the state. *Id.* ¶ 9.  In his declaration, Newman says he is concerned that pesticide use is degrading the bees' habitat and harming them, which also impacts his ability to see them. *Id.* ¶¶ 10–11.

Plaintiffs contend that the "Service's failure to designate critical habitat injures Plaintiffs' members because it 'demonstrably increase[s]' the 'specific risk of environmental harms that imperil the[ir] members' particularized interests' in viewing the bee in its habitat," including in areas like the Bell Bowl Prairie and the Minnesota Valley National Wildlife Refuge where the members seek out the bee.  Pls.' Reply at 36, quoting *Growth Energy*, 5 F.4th at 27 (brackets in original); *see* Pls.' Mot. at 43–44.  Further, they argue that the failure to designate critical habitat

16

means it is more likely that the Environmental Protection Agency will approve the use of neonicotinoid insecticides in areas occupied by the bee.  Pls.' Reply at 40–42; *see* Suppl. Bolt Decl. ¶¶ 3, 6; Suppl. Casey Decl. ¶ 9; Suppl. Taylor Decl. ¶¶ 6–7.[14]  These arguments are intertwined with plaintiffs' assertions that they have also met the causation requirement: that the failure to designate has and will cause them injury because the bee will not enjoy the protections of a critical habitat designation.  In any event, these declarations are enough to establish the first necessary element of a concrete, and actual or imminent injury in fact.

---

[14]    Plaintiffs assert that their "challenge involves a procedural injury," but that they "have standing regardless of whether the Court applies a 'procedural injury' or a 'substantive injury' analysis."  Pls.' Reply at 34.  "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact.  In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016), as revised (May 24, 2016) (emphasis in original).  "[I]t is well established that a plaintiff has standing to bring a claim concerning a procedural injury if she can show that the agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff."  *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 24 (D.D.C. 2020) (K.B. Jackson, J.), quoting *Lujan*, 504 U.S. at 573 n.8.  And "[i]n a case alleging a procedural injury, [the court will] relax the redressability and imminence requirements of standing."  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (internal quotation marks omitted).

Here, plaintiffs' allegations do not establish there has been a procedural injury.  They do not challenge the government's failure to *publish* a  critical habitat designation.  *See, e.g.*, *Ctr. for Biological Diversity*, 861 F.3d at 182–83 (describing EPA's failure to meet its statutory consultation obligations when it failed to make an effects determination and to consult as an "archetypal procedural injury"); *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 592–94 (D.C. Cir. 2019) (finding that EPA's failure to determine whether a rule may affect endangered species or critical habitat as required under the Endangered Species Act was a procedural injury); *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 11, 13 (D.C. Cir. 2020) (describing FERC's failure to satisfy its consultation requirements under the National Historic Preservation Act as an "alleged procedural violation"); *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 336 (D.D.C. 2021) (noting that the harm associated with the USDA's failure to utilize notice-and-comment procedures as required under the Administrative Procedure Act was a procedural injury).  Rather, the alleged injury stems from the Service's failure to designate critical habitat under the "not prudent" exception.  *See* Compl. ¶¶ 85–109.

Plaintiffs have stated they use the affected areas, including the Bell Bowl Prairie and Minnesota Valley National Wildlife Refuge; that the absence of a critical habitat designation will reduce the aesthetic and recreational values of these areas, *see, e.g.*, Newman Decl. ¶¶ 10–11 (expressing concern about pesticide use near bee's habitat in absence of critical habitat designation); Suppl. Taylor Decl. ¶¶ 3, 8 (detailing concerns about the use of pesticides in bee's habitat in the absence of critical habitat designation); and have provided a description of their past and future concrete plans to visit the areas, *see, e.g.*, Bolt Decl. ¶ 14 (describing plans to visit Bell Bowl Prairie); Newman Decl. ¶ 3 (averring he lives in Minnesota near where the bee has been found); Casey Decl. ¶¶ 4, 10–11 (attesting that he plans to go on daily walks and hikes and look for the bee, in places including the Minnesota Valley National Wildlife Refuge).  Plaintiffs have also submitted reports demonstrating a link between pesticide use in the bee's habitat and habitat degradation, *see* Admin. R. at RPBB0380–88; *see also* Pls.' Reply at 41 (citing FWS Rusty Patched Bumble Bee (*Bombus affinis*) Species Status Assessment: Final Report, Version 1 (June 2016), RPBB0208–13).  Defendants acknowledge that "[h]abitat loss and degradation are . . . considered a threat to the rusty patched bumble bee . . . ." Defs.' Mot. at 5.  Taken together, the record shows that the injury-in-fact requirement is satisfied in this case.[15]

## B.   Causation

To show causation, plaintiffs must demonstrate a connection between the alleged injury and the agency action at issue.  *Ctr. for Law & Educ.*, 396 F.3d at 1157, citing *Lujan*, 504 U.S.

---

[15]   The Court is not yet reaching the merits of plaintiffs' case with this finding.  To establish standing, plaintiffs "need not prove the merits of its case . . . , but [] must demonstrate that there is a substantial probability that local conditions will be adversely affected and thereby injure a member of the organization."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (internal quotation marks omitted).

at 560–61.  The connection between the two must not be overly attenuated or speculative, *see id.* at 1161–62, and the Supreme Court has warned that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . ordinarily 'substantially more difficult' to establish."  *Lujan*, 504 U.S. at 562, quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984).

In this context, plaintiffs must show that there is a link between the challenged action – the Service's critical habitat designation – to harm to the bee, and also harm to their members' interests.  According to defendants, nothing in the record shows that the decision "has either caused or will imminently cause federal destruction or degradation of the bee's habitat."  Defs.' Mot. at 10.  Plaintiffs contend, though, that because defendants have not designated critical habitat under section 4 of the ESA, the bee will be unable to enjoy the statutory protections set forth in section 7 of the Act.  *See* Pls.' Mot. at 5–6; Pls.' Reply at 35 ("[T]he Service's 'flawed' Not-Prudent Decision ensures that the Service and other federal agencies will 'fail[] to engage in consultation' about the destruction or adverse modification of the bee's habitat."), quoting *Growth Energy*, 5 F.4th at 27.

Currently, federal agencies are required to consult with the Service if any proposed projects – such as the expansion of the Chicago Rockford International Airport – overlap with an area where the bee may be present, since it is on the Endangered Species List.  The agencies, through what is called section 7 consultation, must ensure that their proposed action is "not likely to

jeopardize the continued existence" of the species.  16 U.S.C. §§ 1536(a)(2),[16] (c)(1);[17] *see Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting) ("Consultation is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species.").  Given the current consultation requirements, the Service maintains that plaintiffs cannot demonstrate that "any injury that would be avoided by adding additional consultation obligations for that *same area* by designating it as critical habitat."  Defs.' Reply at 4–5 (emphasis in original).

But the fact that the Service must already consult with other federal agencies to protect against "jeopard[y] [to] the continued existence" of the bee, 16 U.S.C. § 1536(a)(2), does not mean that further consultation mandated by a critical habitat designation will not prevent further injury. A critical habitat designation would require the Service – in addition – to consult to protect against "the destruction or adverse modification of habitat" of the species.  *Id.*  This requirement is distinct from the other type of section 7 consultation described above.

To "[j]eopardize the continued existence" of a species "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

---

16      16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is *not likely to jeopardize the continued existence of any endangered species or threatened species* or *result in the destruction or adverse modification of habitat of such species which is determined by the Secretary*, after consultation as appropriate with affected States, *to be critical . . . .*") (emphasis added).

17      16 U.S.C. § 1536(c)(1) ("To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into . . . , request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action.  If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.").

the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."   50 C.F.R.   § 402.02.   By contrast, "[d]estruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."   *Id.*

In a final rule concerning the regulations governing interagency cooperation under section 7 of the ESA, the Service and Interior expounded on this distinction:

> The terms "destruction or adverse modification" and "jeopardize the continued existence of" have long been recognized to have distinct meanings yet implicate overlapping considerations in their application.   The phrase "jeopardize the continued existence of" focuses directly on the species' survival and recovery, while the definition of "destruction or adverse modification" is focused first on the critical habitat itself, and then considers how alteration of that habitat affects the "conservation" value of critical habitat.   Thus, the terms "jeopardize the continued existence of" and "destruction or adverse modification" involve overlapping but distinct considerations.

Endangered and Threatened Wildlife and Plants; Reguls. for Interagency Cooperation, 84 Fed. Reg. 44976-01, 44984 (Aug. 27, 2019) (internal citations omitted).   Indeed, in their reply, defendants "do not contest that these are separate requirements triggered by different actions under the ESA."   Defs.' Reply at 10.   Although the Service contends that "it was reasonable for the Service to conclude that adding additional consultation requirements that would be triggered by agency actions likely to destroy or adversely modify occupied critical habitat would not provide any meaningful additional benefit to the bee," *id.* at 11; *see* Defs.' Mot. at 21, the different consultation requirements triggered by the critical habitat designation could affect plaintiffs' interests in observing and interacting with the bee in its habitat.   *See* Pls.' Mot. at 43–44 (arguing that "[w]ithout designated critical habitat in place, federal actions will continue destroying and degrading the bee's remaining habitat without triggering mandatory safeguards that would apply to critical habitat under section 7").

Because it is substantially probable that the Service's designation will create a risk or an increased risk of injury to the bee – and plaintiffs' interest in seeing the bee – they have shown causation.

## C.    Redressability

"To satisfy this element, a plaintiff must show in the first instance that the court is capable of granting the relief sought." *Love v. Vilsack*, 908 F. Supp. 2d 139, 144–45 (D.D.C. 2012); *Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996) (indicating that the "redressability" element of standing entails the question of "whether a federal court has the power to grant [the plaintiff's requested] relief"). Further, it must be likely, and not merely speculative, that the Court can redress the claimed injury. *Ctr. for Law & Educ.*, 396 F.3d at 1157, citing *Lujan*, 504 U.S. at 560–61.

Here, plaintiffs ask the Court to "grant their summary judgment motion; declare unlawful and set aside the Service's Not-Prudent Decision; and direct the Service both to propose and finalize a designation of critical habitat for the bee." Pls.' Mot. at 45; *see* Pls.' Reply at 45; *see also* Compl. at 30 (Request for Relief). The Service argues that plaintiffs have

> fail[ed] to demonstrate that vacatur of the Critical Habitat Determination (or a designation of critical habitat) would redress Mr. Bolt's alleged injury, because there is no evidence indicating that such a result would lead to any added protections for the bee and its habitat in the Bell Bowl Prairie area beyond those that already exist.

Defs.' Mot. at 11; *see* Defs.' Reply at 8 ("Plaintiffs have failed to establish how a remand of the Critical Habitat Determination (or even an ultimate designation of critical habitat) would redress the alleged injuries in some way that the ESA Section 7 protections already provided for areas in which the bee 'may be present' do not."). They also warn the Court that it cannot direct the agency to take any specific action. *See* Defs.' Mot. at 11 n.3; Defs.' Reply at 8 n.3 (plaintiffs are not entitled to "an order that would dictate the outcome of the Service's remand").

While the Court lacks the authority to compel the Service to issue a critical habitat designation, *see Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952), "[i]t is a well-established maxim of administrative law that '[i]f the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 143 S. Ct. 1317, 1320–21 (2023) (per curiam) (edits and omissions in original), quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Here, if the Court concludes that the not prudent decision was arbitrary and capricious, it may remand the decision to the agency for further proceedings consistent with its opinion.  This is exactly the relief that plaintiffs seek.  Therefore, plaintiffs have satisfied the last element of redressability.

Because plaintiffs have shown that they have suffered an injury in fact; that there is a causal connection between the alleged injury and the defendants' conduct; and that the Court can redress the injury, they have established that the Court has jurisdiction to hear their claims.

II.      **The Critical Habitat Designation**

The Endangered Species Act requires the Secretary of the Interior to designate critical habitat to a species on the Endangered Species List "to the maximum extent prudent and determinable."   16 U.S.C. § 1533(a)(3)(A)(i).   Under the 2016 Regulation, a critical habitat designation would not be prudent only when: (1) the species is threatened by taking or other human activity, and identification of critical habitat is expected to increase the threat, or (2) "[s]uch designation of critical habitat *would not be beneficial to the species*."  50 C.F.R. § 424.12(a)(1) (2016) (emphasis added).

Defendants argue that the critical habitat designation is supported by the record and is not arbitrary and capricious, because the determination explains that: (1) habitat loss and degradation are not believed to be causing the bee's decline, Defs.' Mot. at 16; (2) the bee is a habitat generalist and has abundant suitable habitat across its range, *id.* at 21; and (3) section 7 consultation is unnecessary in unoccupied areas and the other potential benefits of a critical habitat designation have been otherwise implemented, *id.* at 25.   *See* 85 Fed. Reg. at 54283–84; Admin. R. at RPBB0003–04.  In their reply, the defendants repeat these arguments, Defs.' Reply at 10–22, and assert for the first time that "[t]he Service reasonably determined that the designation of critical habitat would not confer any additional *meaningful* benefit to the species."  *Id.* at 10 (emphasis added); *see id.* at 11, 12, 14, 16, 19 (writing that critical habitat designation would not provide any "meaningful benefit").

Whether critical habitat would not confer any "meaningful" benefit, though, is not the legal standard.  Only if the designation "would not be *beneficial* to the species" would it appropriate for the Service to withhold a critical habitat designation, which according to the defendants, is intended to be a rare occurrence.  50 C.F.R. § 424.12(a)(1) (2016) (emphasis added); Defs.' Mot.

at 14 n.8 ("Federal Defendants do not dispute that 'not prudent' findings are intended to be rare, and *are* indeed rare.") (emphasis in original); *see Nat. Res. Def. Council v. U.S. Dep't of Interior*, 113 F.3d 1121, 1126–27 (9th Cir. 1997) ("The Service's second reason for declining to designate habitat was that designation 'would not appreciably benefit the species[' because] . . . most populations of gnatcatchers are found on private lands to which section 7's consultation requirement would not apply. . . .  By rewriting its 'beneficial to the species' test for prudence into a 'beneficial to *most of* the species' requirement, the Service expands the narrow statutory exception for imprudent designations into a broad exemption for imperfect designations.").

But even if the Court considers the Service's arguments under the appropriate standard – whether "designation of critical habitat would not be beneficial to the species" – the Service comes up short in articulating a satisfactory explanation for its decision.  The record does not demonstrate that critical habitat "would not be beneficial" in any way to the bee.

First, even if habitat loss and degradation "is not the primary threat to the species," 85 Fed. Reg. at 54281; Admin. R. at RPBB0001; Defs.' Mot. at 16–17, nowhere does the Service suggest that habitat loss is not "a" threat and that negative impacts do not result from this loss.  The Final Rule says that "[h]abitat loss . . . may continue to contribute to current declines, at least for some species," that "loss or degradation of habitat has been shown to reduce both bee diversity and abundance," that "small, isolated patches of habitat may not be sufficient to support healthy bee populations," and that "even slight changes in resource availability could have significant cumulative effects on colony development and productivity."  82 Fed. Reg. at 3190; Admin. R. at RPBB0129.

The Service tries to brush this language aside, contending that "[e]ven if [there is a] finding in the Listing Rule that habitat loss is 'a' primary cause of the bee's decline . . . , that finding does

not somehow render the Service's 'not prudent' finding arbitrary and capricious" because it had "almost *four years* of further data collection analysis between the time of the Listing Rule and the Critical Habitat Determination."   Defs.' Mot. at 18 n.9.   During those four years, in September 2019, the Service prepared and published a Draft Recovery Plan for Rusty Patched Bumble Bee.   *See* Admin. R. at RPBB0041–52.   The Draft contains a disclaimer that it does not represent official Service positions, but in it, the Service wrote that "[t]he remaining populations of rusty patched bumble bee are exposed to a number of interacting stressors, including pathogens, pesticides, habitat loss and degradation."   Admin. R. at RPBB0042–43.   The Draft discussed the need to prevent further loss of bee populations by "improving quality and quantity of habitat" and "ensuring appropriate connectivity between populations."   Admin. R. at RPBB0045.   In the critical habitat designation that was released a year after the Draft, the Service stated again that "habitat loss has established negative effects on bumble bees."   85 Fed. Reg. at 54283; Admin. R. at RPBB0003.   The critical habitat designation states that as of the time it was published, the bee "may not be *as* severely affected by habitat loss," but it does not say the species is *not* affected. *Id.* (emphasis added).

Second, whether the bee is a habitat generalist is a different question than whether it could gain any potential benefits from a critical habitat designation.   Defendants argue that the plaintiffs "fail to point to anything in the record demonstrating that the designation of critical habitat would afford some benefit to the species."   Defs.' Mot. at 22.   But again, defendants upend the standard. It does not matter whether critical habitat would confer "some" benefit, only whether the designation "would *not* be beneficial to the species."   50 C.F.R. § 424.12(a)(1) (2016) (emphasis added).   Moreover, the record does not furnish the logical link for defendants' contention that because the bee is flexible with habitat use, the critical habitat designation would not be beneficial.

Finally, the Service's argument that the currently active section 7 consultation in the bee's occupied areas "make[s] critical habitat designation unnecessary and not beneficial for the bee" is unsupported.  Defs.' Mot. at 26.  As the Court outlined in its standing analysis, a requirement to protect against "jeopard[y] [to] the continued existence" of the bee, 16 U.S.C. § 1536(a)(2), does not equate to a requirement triggered by a critical habitat designation to protect against "the destruction or adverse modification of habitat" of the species.  *Id.*  The Service's other efforts, including the section 7 consultation, the development of the rusty patched bumble bee priority maps, and any other guidance it issues, do not ameliorate any requirements that would be triggered by a critical habitat designation – even if those efforts are ultimately the more effective conservation tools.  *See* Defs.' Mot. at 27 ("[T]he Service's Conservation Management Guidelines and priority maps for the rusty patched bumble bee are likely *more effective* at conferring these non-mandatory benefits than critical habitat . . . .") (emphasis in original); *see Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 28 (D.D.C. 2010) ("[I]t is settled that the ESA does not authorize nondesignation of habitat when designation would be merely less beneficial to the species than another type of protection.") (internal quotation marks omitted).  As far as the Service's conclusion that section 7 consultation in unoccupied areas is not necessary for the conservation of the species, this – once again – misstates the standard.  *See* 85 Fed. Reg. at 54284; Admin. R. at RPBB0004 ("Although we have since found that triggering section 7 consultation in unoccupied areas is not necessary, we have achieved, through development of the priority maps, the other benefits of critical habitat that we had identified in the final listing rule . . . .  Because these maps are updated regularly as we receive new information, they provide better, more focused attention to the needs of rusty patched bumble bee than a static critical habitat designation would.  For these reasons, we find that designating critical habitat would not be

beneficial for the species."); Defs.' Reply at 12 ("[T]he Service reasonably concluded that no *meaningful* benefit would be provided by making impossible predictions regarding particular areas that the species may inhabit in the future to support a designation of unoccupied critical habitat.") (emphasis added).

For all of these reasons, the Court finds that the Service did not set forth a reasoned basis for its decision not to designate critical habitat for the rusty patched bumble bee under the not-prudent standard set forth in the Endangered Species Act.

## CONCLUSION

Plaintiffs' motion for summary judgment will be **GRANTED**, and the defendants' cross-motion for summary judgment will be **DENIED**.

The Court will vacate and remand the critical habitat designation, 85 Fed. Reg. 54281 (Sept. 1, 2020), to the Service for further proceedings consistent with this opinion.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: August 11, 2023